NOT DESIGNATED FOR PUBLICATION

No. 119,411

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KAILA MARIE PRICE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed July 26, 2019.
Affirmed.

*Jonathan W. McConnell*, of Wichita, for appellant.

*Carissa Brinker*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: Defendant Kaila M. Price appeals her conviction for driving under
the influence, a misdemeanor violation of K.S.A. 8-1567, following a bench trial to the
Lyon County District Court on stipulated facts. On appeal, Price argues the district court
erred in denying her pretrial motions to exclude statements she made to law enforcement
officers and the results of a blood test showing her to be over the legal blood-alcohol
limit, and she says without that evidence her conviction must be reversed. Price also
contends the DUI statute is unconstitutionally vague by describing one form of

1

proscribed conduct as "incapable of safely driving." We find those points to be unavailing and affirm the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

The prosecution of Price arose from a single-car wreck that happened sometime before 2:45 a.m. on June 4, 2016, on a rural road in Lyon County. Angelica Prestier and Raymond Peterson were driving in the vicinity when they saw Price walking along the road. They quickly came upon a sedan askew on the side of the road. So they stopped. The car had substantial damage to the driver's side. Nobody was in or around the vehicle. Connecting Price and the car, Prestier and Peterson took on the role of Good Samaritans. Prestier remained with the car and called 911, while Peterson drove back to get Price. He found Price, and they returned to the wreck.

In the meantime, Lyon County Deputy Steve Dall received a dispatch call at 2:46 a.m., arrived at the wreck, and spoke with Prestier. An emergency medical crew also responded. When Peterson returned to the scene with Price, an emergency medical technician examined Price and treated her for what appeared to be minor injuries to her forehead. He then turned Price over to Dall, who questioned Price while she sat in his patrol car. About 40 minutes later, Dall informed Price she was under arrest and placed her in handcuffs. During that time, at least two other officers had arrived and participated in the investigation of the mishap. At least one of them joined in the questioning of Price for a time. And one of the officers found a half empty bottle of vodka in the car.

After Dall drove Price to the law enforcement center, she declined to perform any field sobriety tests and refused a breath test. Dall then obtained a search warrant for a blood draw from Price. Dall took Price to a nearby hospital where medical personnel obtained a blood sample from Price at about 6:40 a.m. A later analysis of the sample showed Price had a blood-alcohol concentration of .17.

The State charged Price with driving under the influence in violation of K.S.A. 2015 Supp. 8-1567, as a second offense misdemeanor, and transporting an open container of alcohol, a misdemeanor violation of K.S.A. 2015 Supp. 8-1599. Price, through her lawyer, filed numerous pretrial motions. Pertinent to the appeal, Price sought to exclude as trial evidence any statements she made to Deputy Dall on the grounds that his questioning of her constituted a custodial interrogation and he never advised her of her *Miranda* rights. She also sought to exclude the admission of the blood test results. The district court excluded some of Price's statements but denied the motion to bar the blood test results.

The State revised the DUI charges, so Price faced alternative violations of K.S.A. 2015 Supp. 8-1567 for operating a motor vehicle with a blood-alcohol concentration of .08 or more and for operating a motor vehicle while incapable of doing so safely because of the consumption of alcohol. See K.S.A. 2015 Supp. 8-1567(a)(1), (a)(3). Price waived her right to a jury trial, and she and the State elected to try the case to the district court on stipulated facts. The stipulated factual record for trial consisted of various motions and memoranda previously submitted to the district court, police reports, the toxicology report and other materials related to the blood draw, transcripts from two pretrial hearings, and video recordings from the scene on June 4, 2016, made with cameras in two patrol cars. Based on the stipulated trial record, the district court found Price guilty as charged and imposed sentences consistent with the governing statutes.

LEGAL ANALYSIS

On appeal, Price challenges only her conviction for driving under the influence and raises four points: (1) the district court erred in admitting some of her statements to Deputy Dall; (2) the district court erred in admitting the test results from the blood draw; (3) K.S.A. 2015 Supp. 8-1567(a)(3), proscribing driving a vehicle when unable to safely

3

do so, is unconstitutionally vague; and (4) the State presented insufficient evidence to support her conviction on the alternative DUI charges. As we explain, the first, second, and fourth points are interconnected, so we look at them together to determine what legal relief, if any, may be due Price. We then turn to her constitutional challenge.

*Exclusion of Price's Statements*

As to the statements, Deputy Dall testified that he never informed Price of her *Miranda* rights. See *Miranda v. Arizona,* 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Nobody else did, either. Government agents are required to inform a person in custody of those rights to avert impermissibly coercive interrogations and to preserve that person's protection against self-incrimination guaranteed in the Fifth Amendment to the United States Constitution. 384 U.S. at 444-45. A person is considered "in custody" for that purpose if he or she has been formally arrested or has been deprived of his or her freedom in a significant way functionally equivalent to an arrest. *Miranda*, 384 U.S. at 444, 478-79. The accepted judicial test explores whether, under the circumstances, a reasonable person would conclude he or she could not terminate the questioning and leave. See *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."); *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012); *State v. Fritschen*, 247 Kan. 592, 601-03, 802 P.2d 558 (1990) (discussing and adopting the objective standard of evaluating whether a person was in custody for purposes of *Miranda*).

A district court should determine whether police questioning amounts to a custodial interrogation requiring *Miranda* warnings based on the totality of the circumstances. The Kansas Supreme Court has identified a set of factors geared toward making that determination. See *Warrior*, 294 Kan. at 496-97. The interaction between

4

law enforcement officers and an individual may turn into a custodial interrogation even though it didn't start out that way.

To remedy the failure of law enforcement officers to inform a person in custody of his or her *Miranda* rights, the district court should preclude the State from using those statements as evidence against that person in its case-in-chief at trial. *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *United States v. Smith*, 831 F.3d 793, 798 (7th Cir. 2016). The remedy, then, does not prohibit prosecution but limits the evidence the government may use in that prosecution.

As we indicated, the district court found that Price was effectively "in custody" when Dall told her she was under arrest and placed her in handcuffs. The district court then suppressed statements Price made after her arrest. Price counters that she was actually in custody when the emergency medical technician delivered her to Deputy Dall at his specific request. There are fair arguments against both of those positions. We mention by way of example that while Price was sitting in the patrol car she asked Deputy Dall when she could leave. Deputy Dall did not respond to her request and simply continued the questioning by asking when she last had anything to drink. That exchange, particularly Deputy Dall's refusal to tell Price that she was free to leave in response to her direct question, would be indicative of a custodial interrogation, although not necessarily conclusively so if considered alone. We do not know what the emergency medical technician told Price when he took her to the patrol car. His explanation, if any, might have caused a reasonable person in Price's position to believe she no longer had the liberty to walk away from the scene.

Rather than wading into an intricate analysis of the circumstances to determine precisely when Deputy Dall's questioning of Price amounted to a custodial interrogation—an exercise that looks to be less than clear-cut—we prefer to wish the entire dispute away. We do that by assuming without deciding that Price is right on this

issue even though that's probably incorrect. In turn, based solely on that assumption, we say for forensic purposes all of her statements to Deputy Dall and the other officers should not have been considered among the stipulated facts in the bench trial. That is the legal remedy due Price.

If the remaining evidence contained in the stipulated facts was sufficient to support Price's DUI conviction, then any error the district court may have made in deciding the motion to suppress the statements was legally harmless. We may analyze the evidence for that purpose because Price was tried in the district court on stipulated facts. Reviewing stipulated or agreed-upon facts requires no credibility determinations or weighing of conflicting evidence. We can perform that task just as well as the district court did. See *In re Marriage of Stephenson and Papineau*, 302 Kan. 851, 854, 358 P.3d 86 (2015).

*Exclusion of Blood Test Results*

We take more or less the same approach to Price's argument for excluding the results of the blood test. Price offers several reasons the test results should not have been admitted as evidence. First, she says the content of the DC-70 form that Deputy Dall read to her regarding blood-alcohol testing did not conform to the applicable statute. The Kansas Attorney General's Office drafted a modified DC-70 form in light of Kansas Supreme Court rulings finding the statutory language to be improper. We don't plumb the argument itself any further given how we ultimately handle the blood test results. The argument hinges on something of a Catch-22, as Price acknowledges, in that the DC-70 is supposed to mirror the statutory language, but the court had declared that language defective. We assume for forensic purposes the dispute is irrelevant to a blood draw obtained with a search warrant. See K.S.A. 2015 Supp. 8-1001(s) (noncompliance with notice requirements does not affect admissibility of blood test results when sample obtained in conformity with search warrant).

6

Price also argues the blood test results should be excluded as evidence because the sample was obtained more than three hours after the driver of the car (whoever it was) had the wreck. A dispatcher relayed the incident to Deputy Dall at 2:46 a.m., after Prestier reported it to 911, meaning the mishap occurred before then. The blood draw was taken from Price at 6:40 a.m. Price rests her argument on K.S.A. 2015 Supp. 8-1567(a)(2) that criminalizes driving with a blood-alcohol level of .08 or more "as measured within three hours of . . . operating . . . a vehicle." She reasons that a test administered outside that three-hour limit should be treated as inadmissible evidence.

Although the results of a test administered more three hours after the defendant has driven do not prove a conviction under K.S.A. 2015 Supp. 8-1567(a)(3), the Legislature has deemed the results to be "other competent evidence" to prove a violation of K.S.A. 2015 Supp. 8-1567(a)(1) for operating a motor vehicle with a blood-alcohol concentration of .08 or higher. See K.S.A. 2015 Supp. 8-1013(f)(1) (defining "other competent evidence" to include results of blood-alcohol testing of samples obtained three or more hours after operation of a vehicle). Price's test result fits within the definition of other competent evidence and, therefore, was admissible in the bench trial to prove the DUI charge under K.S.A. 2015 Supp. 8-1567(a)(1). But Price was also prosecuted for a violation of K.S.A. 2015 Supp. 8-1567(a)(3), and the blood test result was not plainly admissible as to that charge.

Price makes an alternative argument that the test result isn't relevant in the sense of making a material proposition or fact more likely true or less likely true. That is, evidence showing Price's blood-alcohol concentration to be .17 at least four hours after she had been driving does not in and of itself tend to prove her blood-alcohol concentration was .08 or greater when she was driving. Price says that sort of conclusion would require additional evidence from someone with expertise in how the human body absorbs and dissipates alcohol. The stipulated facts include no such evidence. And the evidence on

7

how much Price drank and when is limited, especially if her statements to Deputy Dall are discarded. Again simply for forensic purposes, we assume Price's alternative argument to be correct. Likewise, there was no evidence that Price's blood-alcohol concentration showed or tended to show she would have been unable to drive safely hours earlier when she wrecked the car.

Given our assumption, the stipulated facts do not support Price's conviction for operating a motor vehicle with a blood-alcohol concentration of .08 or greater. But the district court also convicted Price of the alternative charge of operating a motor vehicle when incapable of doing so safely in violation of K.S.A. 2015 Supp. 8-1567(a)(3). To convict under that subsection, the State must prove the defendant drove a motor vehicle and was sufficiently intoxicated that he or she could not do so safely. Here, Price challenges the sufficiency of the evidence, so we construe the stipulated facts in a light favoring the State, as the prevailing party, and give it the benefit of inferences reasonably drawn from those facts. See *State v. Jenkins*, 308 Kan. 545, Syl. ¶ 1, 422 P.3d 72 (2018); *State v. Butler*, 307 Kan. 831, 844-45, 416 P.3d 116 (2018); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006). We then simply ask whether a rational fact-finder could have found guilt beyond a reasonable doubt based on that evidence. *Butler*, 307 Kan. at 844-45; *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014).

*Sufficiency of the Evidence*

We now examine the stipulated facts to determine if sufficient evidence supports Price's conviction under K.S.A. 2015 Supp. 8-1567(a)(3), applying our assumptions excluding the statements Price made to Deputy Dall and giving the blood test results no material weight in determining her intoxication at the time of the wreck. In doing so, we recognize that the elements of even the most serious crime can be proved through circumstantial evidence alone. *State v. Jefferson*, 297 Kan. 1151, 1167, 310 P.3d 331 (2013). So a conviction may rest solely on circumstantial evidence.

8

• Prestier and Peterson first saw Price walking alone on a rural road in the middle of the night, and they quickly discovered she was walking away from a car that had recently been wrecked. They saw no one else in the vicinity. Price was barefoot. Law enforcement officers found a pair of sandals in the car. Price was the registered owner of the car. One of the officers determined the driver's seat was positioned consistent with accommodating a person of Price's approximate height.

All of that evidence strongly associates Price with the car. And it circumstantially shows her to have been the driver, particularly the positioning of the driver's seat and the absence of any other candidate.

• After Peterson picked up Price and drove back toward the car wreck, Price asked him to help her hide the car. As they approached the scene and could see the ambulance and the patrol car, Price asked Peterson not to stop and explained she would be in trouble. Peterson told law enforcement officers that Price smelled as if she had been drinking and that he was sure she was intoxicated.

Peterson's observations and opinion as to Price's insobriety are relevant. They support a conclusion Price was intoxicated at that time. See *State v. Shadden*, 290 Kan. 803, 819-20, 235 P.3d 436 (2010) (Courts commonly receive lay opinion testimony as to whether a person is intoxicated based on the witness' observations of the person's conduct and appearance.). Deputy Dall had the same opinion based on his interaction with Price. His conclusion similarly supports a finding that Price was intoxicated. Although we have assumed that Price's statements to Deputy Dall should be excluded as evidence because of his failure to provide *Miranda* warnings, that doesn't bar his observations of Price's manner of speech or other aspects of her physical comportment or his opinion of her insobriety based on those observations.

9

Price's statements to Peterson are admissible, and they are telling. Her first request to Peterson indicated she had firsthand knowledge of the mishap—the request having been made before they were within sight of her car. It also evinced a guilty mind, since there would have been no reason to cover up physical evidence of a benign event. The implication was only redoubled when, upon seeing a patrol car, Price asked Peterson to keep on driving because she would be in trouble if they stopped. That comment amounts to circumstantial evidence that Price believed she had some potential criminal responsibility or liability for what had happened. See *State v. Paulson*, No. 108,795, 2015 WL 6444314, at *20 (Kan. App. 2015) (unpublished opinion) ("A defendant's efforts to cover up a crime or to evade capture are at least suggestive of guilt on the theory an innocent person wouldn't engage in that sort of conduct."). Given the situation, the obvious liability she feared would be a charge of driving under the influence. Although not a confession, Price's statements to Peterson were damning.

• The stipulated facts concerning the mishap itself are comparatively limited. But they show Price's car apparently skidded off the roadway and struck a tree stump, seriously damaging the driver's side. The car then careened back toward the road. Nothing in the stipulation suggests significant extenuating circumstances that might account for the wreck, such as avoiding a deer or some inanimate obstruction on the road. Deputy Dall's report indicated the weather was rainy and the road was wet. But he stated the rain only became heavy as he drove to the accident scene.

The circumstances of a car wreck may be sufficient to support the requirement of unsafe driving for a DUI conviction under K.S.A. 2015 Supp. 8-1567(a)(3). This court has consistently recognized that wrecks, particularly those that appear to have been caused by extreme driving errors otherwise unexplained by external physical conditions, evince unsafe operation of a motor vehicle. See *State v. Alexander*, No. 114,729, 2016 WL 5344569, at *4 (Kan. App. 2016) (unpublished opinion) (evidence showed defendant "grossly miscalculated" turn on residential street during day, "way overcorrected," and

then "fishtailed," supporting finding of unsafe operation of motor vehicle in DUI prosecution); *State v. Swingle*, No. 107,856, 2013 WL 4729565, at *4 (Kan. App. 2013) (unpublished opinion) (car left roadway, crossed ditch, and hit fence during day and in good weather—so "[t]he mishap itself is consistent with and would be indicative of an impaired driver"); *State v. Bardsley*, No. 105,324, 2012 WL 1072759, at *2-3 (Kan. App. 2012) (unpublished opinion); *State v. Guinn*, No. 94,114, 2005 WL 3527080, at *3 (Kan. App. 2005) (unpublished opinion). A recurrent scenario entails a single vehicle mishap in which the driver inexplicably swerves or skids off the road and strikes an object, often a tree or fence post, disabling the vehicle. We see that scenario played out here.

In short, after discarding Price's statements to Dall and discounting the blood test results, the remaining stipulated facts are sufficient to support a DUI conviction under K.S.A. 2015 Supp. 8-1567(a)(3). Accordingly, any error the district court may have made in considering either some of Price's statements or the blood test results would be harmless. We may make that determination because, as we have said, the prosecutor and Price stipulated to the facts, so assessing their effect entails no credibility determinations or weighing of conflicting evidence. The sufficiency of those stipulated facts to support a conviction presents a question of law. See *In re Marriage of Stephenson and Papineau*, 302 Kan. at 854; *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 258-59, 261 P.3d 943 (2011) (when controlling facts undisputed, issue presents question of law).

*Void for Vagueness Challenge to K.S.A. 2015 Supp. 8-1567(a)(3)*

Price contends K.S.A. 2015 Supp. 8-1567(a)(3) is unconstitutionally vague and fails to give potential defendants fair notice of what the Legislature has intended to criminalize. The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that criminal statutes sufficiently outline what is proscribed so that reasonable persons may conduct themselves to avoid prosecution and conviction. See *United States v. Batchelder*, 442 U.S. 114, 123, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979)

11

(constitutional due process requires criminal statute provide fair notice of proscribed conduct); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 165, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972); *State v. Watson*, 273 Kan. 426, 430, 44 P.3d 357 (2002) ("'[A]n enactment . . . [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'") (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 [1972]). Likewise, a criminal statute must be sufficiently definite that government agents may apply it without engaging in broad guesswork or arbitrary enforcement. *Smith v. Goguen*, 415 U.S. 566, 572-73, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974) (constitutional due process "requires legislatures to set reasonably clear guidelines for law enforcement officials").

Price assails the statutory proscription that a driver be under the influence "to a degree" that renders him or her "incapable of safely driving" as impermissibly vague. See K.S.A. 2015 Supp. 8-1567(a)(3). As we understand the argument, Price sees two problems with the statutory language. First, she says "the degree" or level to which the driver must be under the influence is unquantified and, thus, vague. Second, she says being "incapable of safely driving" doesn't adequately define a level of poor driving. We are unpersuaded the statute is constitutionally deficient in those respects.

As to the first, the degree of intoxication under K.S.A. 2015 Supp. 8-1567(a)(3) is not governed by a defined physiological measure, such as a specific blood-alcohol concentration. That's actually the point of the subsection. The proscribed level of intoxication is defined by driving performance. So if persons have been drinking and then operate motor vehicles unsafely, they have violated K.S.A. 2015 Supp. 8-1567(a)(3) regardless of their blood-alcohol concentrations or how many beers or glasses of wine they have consumed. The degree of intoxication measured by blood-alcohol concentration will vary from driver to driver. But a reasonable person—the hypothetical being by whom we measure fair notice—may be expected to understand when his or her faculties have been impaired by one too many drinks and he or she cannot drive safely.

12

That observation brings us to Price's second attack on K.S.A. 2015 Supp. 8-1567(a)(3) and what "safely driving" a vehicle means and, thus, what amounts to its negative—the incapability of doing so. Safe and safely are commonly understood to entail that which is "free from . . . danger" or "prudent" or "cautious." See Webster's New World College Dictionary 1279 (5th ed. 2014) (definition of "safe"). A licensed driver generally may be expected to be familiar with the rules of the road and conduct amounting to moving violations and, in turn, to obey the first and refrain from the second. Cf. *Gard v. Sherwood Construction Co.*, 194 Kan. 541, Syl. ¶ 6, 400 P.2d 995 (1965) (motorist may assume other motorists will obey rules of road absent particular circumstances undermining assumption); PIK Civ. 4th 121.85 (2012 Supp.) (same). Driving in that manner may be considered prudent, cautious, and safe. A driver unable to do so because he or she is intoxicated fairly should be considered "incapable of driving safely." The standard set out in K.S.A. 2015 Supp. 8-1567(a)(3) is not unconstitutionally vague measured that way. The language provides fair notice both to motorists and to law enforcement officers.

Price's vagueness argument premised on inconsistent or arbitrary enforcement of K.S.A. 2015 Supp. 8-1567 seems particularly wide of the mark. A law enforcement officer must have some articulable factual basis to make a traffic stop. See *State v. Thompson*, 284 Kan. 763, 773-74, 166 P.3d 1015 (2007). Typically, an officer will initiate a stop because the motorist has committed a traffic infraction of some sort. Upon interacting with the driver, the officer may discover evidence suggesting the driver is intoxicated, e.g., the smell of alcohol, slurred speech in responding to questions, or impaired dexterity in producing a license or proof of insurance. Sometimes, however, a law enforcement officer may observe erratic driving indicative of impairment that does not necessarily amount to a traffic infraction, such as excessive weaving within a lane for no apparent reason or an unusually slow speed or inexplicable changes in speed. In all of

13

those situations, however, the officer identifies factual bases for stopping a driver that undercut some form of arbitrary or otherwise impermissible enforcement.

This case does not fit the traffic stop model. But that's because Price had already stopped as a result of the wreck. Deputy Dall had begun investigating the accident and the abandoned car when he encountered Price. He immediately recognized physical indicators that Price was intoxicated. Again, nothing about that sort of interaction suggests arbitrary enforcement indicative of an unduly vague statute.

Price's argument that K.S.A. 2015 Supp. 8-1567(a)(3) affords insufficient notice to drivers of the forbidden conduct also falters. The Due Process Clause requires reasonable notice commensurate with the purpose of the statute and the nature of the proscribed conduct. Criminal statutes should be drawn with that degree of precision as the subject matter reasonably permits in light of the liberty interests at stake in a prosecution. See *Goguen*, 415 U.S. at 581 ("There are areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision."). Mathematical precision is not required. *Grayned*, 408 U.S. at 110; *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000). Criminal statutes, thus, may be cast in language general enough to take into account various forms of proscribed conduct without running afoul of constitutional fair notice requirements. See *Colten v. Kentucky*, 407 U.S. 104, 110, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972). Statutory language typically provides fair notice when "the general class of offenses" covered is reasonably described, even though "doubts may arise" regarding conduct at the margins of the proscription. *United States v. Harriss*, 347 U.S. 612, 618, 74 S. Ct. 808, 98 L. Ed. 989 (1954); *State v. Williams*, 308 Kan. 1439, 1460, 430 P.3d 448 (2018); *Agnew v. Government of the District of Columbia*, 920 F.3d 49, 56 (D.C. Cir. 2019). Nonetheless, criminal statutes that potentially abut constitutionally protected activity, such as free speech or assembly, must be more exacting in their definitions of proscribed conduct because any indefinite margins may inhibit the exercise of a fundamental right. *Grayned*, 408 U.S. at 108-09.

14

Consistent with those principles, K.S.A. 2015 Supp. 8-1567(a)(3) provides fair notice of the prohibited conduct—a person drives a motor vehicle after consuming enough alcohol that he or she cannot safely do so. The amount of alcohol is not the point; the degree of impairment is. The core conduct, though described generally, is reasonably defined in understandable terms. In some marginal cases, a given person arguably might be capable of driving safely notwithstanding his or her intoxication. But that possible imprecision in separating the marginally safe from the marginally unsafe doesn't add up to a denial of constitutional fair notice. And the statute does not come close to intruding upon protected First Amendment rights, so the prohibitory language need not be drawn with surgical exactitude.

Moreover, a key purpose of K.S.A. 2015 Supp. 8-1567(a)(3) is to deter drunk driving, so the statute reflects a compelling public policy and exercise of legislative police powers. In upholding DUI checkpoints run in a nondiscriminatory way as constitutionally reasonable, the United States Supreme Court observed that "'[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990). The Court likened the deaths and injuries caused by drunk drivers to losses "'only heard of on the battlefield.'" 496 U.S. at 451 (quoting *Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S. Ct. 408, 1 L. Ed. 2d 448 [1957]). Although traffic fatalities have declined in recent years, drunk driving remains a leading cause of highway deaths and still poses a substantial threat to public safety. *Birchfield v. North Dakota*, 579 U.S. ___, 136 S. Ct. 2160, 2178, 195 L. Ed. 2d 560 (2016). Those objectives advanced in K.S.A. 2015 Supp. 8-1567(a)(3) weigh heavily on the side of the statutory language. The limited imprecision of the language at its margins can't tip the fair-notice scales the other way to void the statute for vagueness.

15

Although the Kansas appellate courts have not ruled on the particular challenge Price makes, they have considered the indefiniteness of language in earlier versions of K.S.A. 8-1567 that criminalized simply operating a motor vehicle "under the influence of alcohol." *State v. Reeves*, 233 Kan. 702, 664 P.2d 862 (1983); *State v. Campbell*, 9 Kan. App. 2d 474, 681 P.2d 679 (1984). Those decisions have some peripheral bearing on the vagueness issue, so we mention them in wrapping up our discussion. Neither opinion, however, offers an expansive analysis directly reaching what we have addressed here.

In *Reeves*, the court recognized that the statutory phrase "under the influence of alcohol" had been consistently construed to mean a degree of intoxication rendering a person "incapable of safely driving." The court suggested the qualification captured the legislative intent in criminalizing that form of drunk driving. 233 Kan. at 703-04. The *Reeves* decision arose from the State's appeal of a question reserved on whether juries deciding DUI cases should be given some explanation of the term "under the influence." In responding to the question, the court acknowledged that the statute defined the offense "only generally," so jurors would benefit from "guidance" in an instruction explaining that "under the influence of alcohol" requires that degree of intoxication rendering the defendant "incapable of safely driving a vehicle." 233 Kan. at 704.

About a year later, this court rejected Emery Campbell's argument that his two DUI convictions should be set aside because the phrase "under the influence" was impermissibly vague. *Campbell*, 9 Kan. App. 2d at 475. The terse discussion does not outline precisely why Campbell believed the statutory language failed to give fair notice of the offense. Relying heavily on *Reeves*, the court found that the statutory language supplemented with an instruction to the jurors that a defendant could be convicted only if he or she were incapable of safely driving provided sufficient definiteness. 9 Kan. App. 2d at 475.

16

What the courts endorsed in *Reeves* and *Campbell* as judicial gloss—the qualification that a defendant must be incapable of safely driving to be convicted—has since been codified and made part of the offense proscribed in K.S.A. 8-1567(a)(3). And it is that aspect of the statute Price assails as indefinite and, therefore, constitutionally infirm.

We offer several suppositions. We suppose the judicial concern in *Reeves* and *Campbell* arose because the phrase "under the influence" at least read literally could apply if a person simply felt the slightest effects of consuming alcohol, say one beer or a glass of wine with dinner awhile before getting behind the wheel. We don't know for sure because neither court really said. We may also suppose both courts were satisfied that amplifying the statutory language with the requirement a person be "incapable of safely driving" fixed the problem with "under the influence" as a notably general proscription. But the opinions offer no concrete explanation of either the defect or why the repair works. We might also suppose the courts did not see the repair itself as injecting some additional vagueness into describing what can be punished as driving under the influence. But nobody challenged the fix itself as impermissibly vague, and the courts didn't address, let alone defuse, the possibility.

But Price has now loosed that arrow. And without relying on suppositions, we can't conclude *Reeves* and *Campbell* turn the arrow away. We decline to rest our resolution of this void-for-vagueness challenge on arguably attenuated inferences drawn from brief judicial discussions of a different void-for-vagueness challenge. By the same token, however, *Reeves* and *Campbell* lend no support to Price's position.

Having considered the arguments Price has raised on appeal, we find no basis to reverse her conviction and the resulting sentence.

Affirmed.

17

\* \* \*

ARNOLD-BURGER, C.J., concurring:  I concur in the result.